UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert SOLOMON, Charles Sokolow,
Defendants-Appellants.

No. 80–5975.

United States Court of Appeals,
Eleventh Circuit.

Sept. 20, 1982.

Patrick D. Doherty, Clearwater, Fla., for Solomon.

Louis Vernell, Miami Beach, Fla., for Sokolow.

Gary J. Takacs, Frank W. Trapp, Asst. U. S. Attys., Tampa, Fla., for the U. S.

Before WISDOM \*, RONEY and HATCHETT, Circuit Judges.

WISDOM, Circuit Judge:

This appeal involves an alleged criminal conspiracy. In June 1980, a federal grand jury in Tampa, Florida, returned a one-count indictment against eight persons, including the defendants/appellants Robert Solomon and Charles Sokolow. The indictment charged the defendants and others with conspiring to commit violations of Title 18, United States Code, Sections 659, 2313, 2314, and 2315: stealing and possessing goods stolen from vehicles in interstate commerce; receiving stolen motor vehicles; transporting stolen goods between states; and receiving stolen goods. Of the eight defendants three pleaded guilty, one was acquitted in a separate trial, one had the indictment against him dismissed, and the other three, including Solomon and Sokolow, appellants, were found guilty. Lee Fruman did not appeal his conviction. We affirm the judgments against Solomon and Sokolow.

## I.

On October 14, 1980, the trial of the defendants Solomon, Sokolow, and Lee Fruman began in the district court. The government's case rested upon the testimony of Arthur Reid Collum, the central figure in the alleged conspiracy. Collum testified that in early 1975 he met with Purvis in Tampa, Florida and that they agreed that if Collum stole or hijacked truckloads of goods, Purvis would sell the products for a percentage of the profit through fences in Miami with whom he had done business in the past. Later Purvis identified the fences as Solomon, Sokolow, Katzif, and Bennett.

In August 1975 Collum stole a tractor with a refrigerated T. G. Lee trailer containing fruit juices, from a Ryder Truck rental yard in Tampa. Collum telephoned Purvis to tell him of the theft and to receive instructions. Purvis gave Collum Solomon's telephone number in Fort Lauderdale to call. Solomon was a manufacturer and wholesaler of detergents and bought and sold distressed goods in Fort Lauderdale, Florida. Collum called the number and talked with Solomon who told him to go to Lester's Diner and park in the rear of the building. After Collum parked where he was told, Solomon came up, introduced himself, gave Collum his business card, and asked if he was "Reid Collum". After looking at the contents of the trailer, Solomon gave Collum $600 and told him that he would send the rest of the money to Purvis. Collum testified that Solomon knew that the fruit juices were stolen, because he had told Solomon of the theft. At trial Solomon denied that the transaction took place.

After receiving the truck from Collum, Solomon took him to an airport for a flight to Tampa. There Collum called Purvis to report that he had received $600 and that Solomon would be in touch with him. A day or so later, Purvis called Collum and said that he could not reach Solomon. Purvis and Collum decided to drive to Miami to collect the rest of the money due them. On the way, they stopped to call Solomon. Because he was not in, they went to the Reclaim Mart. As Collum explained: "[We went there] because Mr. Purvis knew that Bob Solomon dealt with the people at Reclaim Mart. It was Mr. Purvis's communication to him that he knew that things he had taken Bob before wound up at the Reclaim Mart".

When they arrived at the Reclaim Mart, Purvis introduced Collum to Red Katzif and Louis Bennett, the owners, who were both named in the indictment. Collum saw the stolen fruit juices there. Katzif told Purvis he had paid Solomon between $700 and $800 for part of the load. Purvis told Collum that Solomon received only about $1,200 for the load, so they did not try to obtain any more money from him.

While at the Reclaim Mart, Katzif asked Collum to deal directly with him rather

---

\* Honorable John Minor Wisdom, Judge for the U. S. Court of Appeals for the Fifth Circuit, sitting by designation.

than through Solomon. Katzif told Collum he was interested in dry goods and canned goods, and did not want refrigerated goods. Purvis asked Katzif where they could sell stolen meat. Katzif told them to go to Sunny Isles Motel and get in touch with "Charlie" (Sokolow), the owner of the motel. Katzif agreed to pay Collum one-half of the wholesale price for stolen goods. Purvis and Collum drove to Sunny Isles Motel in Miami where they met Sokolow in the Snackery, an all-night restaurant next to the motel. They agreed that in future transactions they would sell him stolen meat at one-half of the wholesale price. Sokolow said he would buy seven to ten thousand pounds, but could not handle a full load. At trial Sokolow denied that this meeting took place.

Collum participated in more than 20 thefts or hijackings between August 1975 and February 1977. In January 1976 Collum stole a trailer fully loaded with cases of Ragu Spaghetti Sauce in jars. He drove off, using a tractor Purvis furnished to pull the trailer. When he got close to the Reclaim Mart, Collum telephoned Bennett who agreed to buy part of the load. According to Collum, Bennett was afraid to take the full load because that would put too much of one type of product in his warehouse and he was afraid that it might look suspicious. After unloading there and calling Sokolow, they drove over to Sunny Isles Motel where Collum talked to Sokolow. Collum told Sokolow he had sold part of a load to Reclaim Mart. Sokolow bought part of the remaining load, about 150 cases, paying Collum between $300 and $500 in cash, then said that he knew someone he could call who would possibly take the rest of the load. Sokolow then called Fruman to see if he would buy some of the sauce, and gave Collum directions for going to Fruman's place of business, Florida Railroad Salvage. Collum drove to the address and unhitched the tractor from the trailer while it was being unloaded. Collum told Fruman that the sauce was stolen. Fruman, the third defendant in the case, took the rest of the load paying Collum in cash. Fruman asked Collum to deal directly with him rather than through others and gave Collum his business card, adding his home telephone number to it.

In July 1976 Collum and McLendon, a confederate, stole a partially loaded truck containing ten to twelve thousand pounds of shrimp and scallops from Variety Seafood in Tampa. After several unsuccessful efforts to sell the seafood, Collum called Sokolow and offered him the goods. Sokolow agreed and directed Collum to Service Cold Storage where he was to meet a certain person, Dave, and tell him that Sokolow wanted the seafood stored. Collum went to Service Cold Storage, turned over the goods to Dave, and signed a receipt using the name Ray Peterson of Southern Seafood. Collum then went to Sunny Isles Motel where he negotiated a price with Sokolow. According to Collum, Sokolow paid him cash but was unhappy with the deal because he could not make much money off the resale of the seafood. He suggested that Collum steal coffee. Shortly thereafter, Collum was able to fill Sokolow's request for coffee.

In early August 1976 in Montgomery, Alabama, Collum and McLendon, stole a truck with a load of 37,000 pounds of coffee. They abandoned the tractor in Birmingham and had the trailer painted. He telephoned Sokolow to see how much of the coffee he wanted. After stealing a second tractor, he pulled the load to Tampa, Florida. At this point, Solomon reappeared. Collum called Purvis, told him that Sokolow wanted part, and asked if Solomon also wanted part of the load. Purvis said that he would give him a call and get back to Collum. Purvis did get back to Collum and said that Solomon had opened a new outlet for that type of goods and would take the coffee. A few days later Collum delivered most of the coffee to Solomon's mini-warehouse in Ft. Lauderdale. Solomon greeted Collum and had several men unload the coffee. While the trailer was being unloaded at Solomon's, Collum and McLendon rented a U-Haul truck to carry Sokolow's order to him. Upon arriving at Sunny Isles, Sokolow sent them to his second motel, Casaloma. There

they unloaded part of the coffee. Collum returned to Sunny Isles and collected his money in cash from Sokolow. Collum and McLendon then returned the rental truck and went to Solomon's mini-warehouse. Solomon gave Collum some money and told him that he would be in touch with Purvis after he sold the coffee. A few days later, in Tampa, Purvis called Collum and said he had received the money from Solomon. Collum and McLendon met with Purvis in a parking lot and divided the money, about $30,000. Purvis and Solomon worked out the price for the stolen goods.

That is the gist of the government's case. After the government rested, Solomon took the stand in his own defense. He testified that Red Katzif introduced Collum to him as Ray Peterson. He denied buying any fruit juice or coffee from Collum. He denied that he was a licensed food broker, although he had made a prior statement to that effect, and he denied having negotiated large sales of food items although confronted with a prior statement that he had negotiated food deals as a broker. He testified that he had purchased detergents from Purvis and paid less than the wholesale price because the detergents were distressed goods. He denied that the goods were stolen. Solomon said that it was through this transaction that he had come to know Purvis rather than from the events as related by Collum, whom, he said, he had met only once and that was at the Reclaim Mart where Collum was pointed out to him as a professional killer.

Sokolow testified that he owned two motels, the Sunny Isles and the Casaloma, and the Snackery, a small 24 hours-a-day coffee shop. He said that he had first met Collum when Collum had registered in his motel as Ray Peterson. On that occasion, he said that he had bought from Collum 20 cases of distressed tomato sauce for $60 in cash. He denied that Collum told him the sauce was stolen. Sokolow said Collum had asked him about buying shrimp and storing it. He told Collum that he used Service Cold Storage. Sokolow testified that, after Collum had tried unsuccessfully to dispose of a load of shrimp, he purchased 200 six-pound baskets of shrimp for about $700 to $800 in cash. He denied that Collum told him the shrimp was stolen and denied having purchased coffee from Collum. Sokolow argues that the purchase of goods was for legitimate consumption in his restaurant, rather than for resale at a profit.

After the conclusion of the testimony, in a jury instruction conference, the trial judge rejected Sokolow's proposed instructions,[1] saying that he had already covered the subject in his instructions. In his charge to the jury, the trial judge summarized the indictment and instructed the jury on the essential elements of criminal conspiracy in terms similar to the Fifth Circuit Pattern Instruction on general criminal conspiracy.[2] On October 23, 1980, the jury found the three defendants guilty.

Robert Solomon raises only one issue on appeal. He contends that there was a prej-

---

1. The proposed instruction, in crucial part, was as follows:

 I further charge you that the relationship of buying and selling does not prove a conspiracy, such as is charged in the indictment, nor does such relationship of buying and selling establish that either were members of such conspiracy, even though both may have knowledge of the unlawful nature of the goods.

2. The trial judge charged:

 A conspiracy is a combination of two or more persons by concerted action, to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means. So, a conspiracy is a kind of "partnership in criminal purposes", in which each member becomes the agent of every other member. The gist of the offense is a combination or agreement to disobey or to disregard the law.

 Four essential elements are required to be proved in order to establish the offense of conspiracy.

 First, that the conspiracy described in the Indictment was willfully formed, and was existing at or about the time alleged;

 Second, that the accused willfully became a member of the conspiracy;

 Third, that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the Indictment, at or about the time and place alleged; and

 Fourth, that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy, as charged.

udicial variance between the indictment, which charged a single criminal conspiracy, and the proof which, if it established anything conspiratorial, established two separate conspiracies. Charles Sokolow raises several issues on appeal. First, he contends that the district court erred in denying Sokolow's motion to dismiss the indictment, a motion based on prejudicial pre-indictment delay of about three years. Second, Sokolow contends that the district court erred in refusing to admit, as impeachment evidence, prior convictions of Collum. Third, Sokolow contends that the district court erred in excluding favorable character evidence he proffered. Fourth, Sokolow contends that the district court erred in refusing to instruct the jury specifically on the essential elements of criminal conspiracy and in denying his requested jury instruction that buying and selling do not establish a conspiracy.

## II.

First, we address Solomon's single issue on appeal. At the conclusion of the government's testimony, he moved for a dismissal of the charge. He argued, in a contention tangentially related to Sokolow's fourth contention, see Section D of this opinion, that the evidence had not shown a single conspiracy but instead had shown separate, isolated sales which do not of themselves prove a conspiracy between him and the other defendants. There was a variance, therefore, he argues, between the indictment and the proof. The district court rejected Solomon's arguments and denied his motion for a judgment of acquittal, stating orally: "[T]he conspiracy charged here is not a conspiracy to steal Ragu sauce or a conspiracy to steal shrimp or a conspiracy to steal coffee. The agreement allegedly was ... between Collum and Purvis.... Now, the instruction says and the law is that a person—if a person has knowledge of the illegal purpose and agreement which allegedly, in this case, was to obtain—they were truckloads of stolen material, that that is the purpose of the conspiracy, and with knowledge of that illegal purpose, you

joined the conspiracy, became part of it, by doing some act which furthers or seeks to aid in the accomplishment of the conspiracy, and receiving or concealing stolen material would be such an act, then the person becomes a willing participant, a member of the conspiracy." In short, Collum, Purvis, and others did not have a series of separate agreements; there was one ongoing conspiracy with Collum to hijack, Purvis to sell, and Solomon, Sokolow, and others to buy whatever Collum hijacked that could be resold, each like the link in a chain, each depending for his own success on the performance of the others. Moreover there was interaction by Solomon with Katzif and Bennett as well as with Purvis and Collum.

The district judge instructed the jurors that to convict, they must find beyond a reasonable doubt that a defendant "willfully participated" in the conspiracy, that is, he "knowingly" became a part of it; in effect, that Solomon and Sokolow were not simply charged with being buyers of goods available for sale. The instructions emphasized the elements of knowing and willful participation by stating mere "presence at the scene of an alleged transaction or event" was not sufficient to convict. Nor was it sufficient to find that a defendant acted "in a way which furthers some object or purpose of the conspiracy", unless the evidence proved he had knowledge of the conspiracy. The trial judge carefully instructed the jury:

> You are further instructed that proof of several separate conspiracies is not proof of the single or all conspiracies charged in the Indictment, unless one of the several conspiracies which is proved is the single conspiracy which the Indictment charges.
>
> What you must do is determine whether the single conspiracy charged in the Indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants as to that charge.

On appeal, Solomon relies principally on *United States v. Varelli*, 7 Cir. 1969, 407

F.2d 735.[3] He argues that in this case, as in *Varelli*, the evidence was insufficient to warrant the jury's finding of a single, overall conspiracy. In *Varelli*, Solomon notes, the court found that when two conspiracies were proved instead of the single conspiracy charged in the indictment, and where the jury was not properly instructed on multiple conspiracies, the defendant's rights were prejudiced and their convictions were reversed. Solomon argues that in this case the various alleged violations of the law were not drawn together in a single, overall, comprehensive plan, *citing Kotteakos v. United States*, 1946, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; *United States v. Bertolotti*, 2 Cir. 1975, 529 F.2d 149; *United States v. Levine*, 5 Cir. 1977, 546 F.2d 658.

We find the authorities cited by Solomon unpersuasive. *Varelli* involved a conspiracy of specific scope. The core conspirators agreed to steal three truckloads of silver. A fourth theft of photographic equipment was included in the indictment, but the evidence showed that the theft had taken place on the spur of the moment. The court held that it was a separate matter beyond the scope of the conspiracy. The agreement here was not narrowed to a specific type of goods to be stolen. The understanding was that Collum would steal truckloads of various goods to be brokered by Purvis to the people in south Florida whom he knew would dispose of the goods through apparently legitimate businesses, and pay Purvis and Collum for the goods. In *Varelli* the court found, with respect to the silver, that there was an ongoing conspiracy because the conspirators contemplated future thefts. Here too the record confirms the government's position that the parties contemplated future thefts and, by Solomon and Sokolow, future purchases.

*Kotteakos* initially involved thirty-two defendants and had thirteen defendants and eight conspiracies by the time the case was submitted to the jury. In such cases the danger of confusing the jury to the detriment of some defendant is great. The possibility of prejudice from spillover (transference of guilt) increases with numbers: the number of defendants and number of conspiracies. *Bertolotti, supra*, 529 F.2d at 156.

*Levine* is distinguishable. First, the core member of the conspiracy had a legitimate business, unlike the core conspirators here. Second, Solomon, as well as other fences, knew and dealt with some of the other conspirators who received and sold stolen goods. Third, Solomon, independent of his deals with other fences, knew that some of the stolen goods were going elsewhere. In *Levine*, the other conspirators had no actual knowledge of and no reason to infer that other persons were members of the conspiracy.

■ The primary requirement for establishing a conspiracy is the existence of an agreement. *United States v. Perez*, 5 Cir. 1973, 489 F.2d 51. The evidence need not show that each defendant knew of each phase of the conspiracy, all of its details, all of the conspirators, or who participated in each event. *United States v. Metz*, 5 Cir. 1979, 608 F.2d 147; *United States v. Musgrave*, 5 Cir. 1973, 483 F.2d 327. The essence of the agreement here was that various parties would perform different functions in an enterprise to steal and dispose of stolen goods in a manner to avoid detection for each participant's profit. At the core of the conspiracy was Arthur Reid Collum, the man who would steal or hijack the goods. John Purvis was the broker of the stolen goods. But fences were needed to complete their scheme. A number of fences were involved, but Solomon, Sokolow, Katzif, and Bennett each had a part in carrying the scheme to fruition.

**3.** The appellant quoted from *Varelli*, 407 F.2d at 742:

If there is one overall agreement among the various parties to perform different functions in order to carry out the objective of the conspiracy, the agreement among the parties constitutes a single conspiracy. However, where various defendants separately conspired with a common conspirator to obtain loans from an agency of the United States, the Government conceded that there were several conspiracies since there was no overall goal or common purpose.

From the first transaction, several facts and inferences demonstrate that Solomon was a part of the conspiracy. Solomon and Purvis already had an ongoing relationship that involved the use of short-term credit; Purvis received payment not on delivery but after resale. As previously stated, in August 1975, Collum stole a tractor and trailer loaded with refrigerated fruit juices. After the theft, Collum called Purvis who directed him to take the load to Miami and to call a number. That number turned out to be Solomon's. A jury could infer that this was not a coincidence. At their initial meeting, Solomon asked Collum if he was "Reid". Then Collum turned the stolen load over to Solomon for $600. Collum, according to his testimony, told Solomon that the goods were stolen. It was to the interest of Collum and Purvis that Solomon have this knowledge, to insure that he would be careful in reselling so that the goods would not be traced back to them. A jury could reasonably infer that Solomon knew and dealt with the Reclaim Mart, operated by two co-defendants, because part of the load of stolen fruit juice Collum left with Solomon was next seen by Collum at the Reclaim Mart. Finally, Solomon's giving Collum his business card shows a desire for ongoing dealings with him.

A subsequent transaction confirms Solomon's role in the conspiracy. In the fall of 1976, Collum, after stealing a load of coffee, told Purvis to see if Solomon wanted some of the coffee. Purvis said Solomon did. As a result, Collum delivered the major portion of a load of coffee to Solomon, who gave Collum an advance and said that he would send the rest to Purvis. While Solomon was unloading his share of the coffee, Collum and McLendon put part of the load into a rental truck to take to Sokolow.

■ We conclude that a reasonable jury could reasonably infer that Solomon maintained an ongoing business relationship with Collum and Purvis, his initial link in the conspiracy. The success of this enterprise depended on Solomon's resale of the goods to raise the money to pay the core conspirators for their roles in the agree-ment. Unlike the defendants in *Levine*, here the principal participants were dealing solely in stolen goods and Solomon knew, at least according to the testimony of Collum, both that the goods were stolen and that he was receiving only part of a larger load. He knew, therefore, that he was aiding in a larger scheme; there were other fences in the scheme. As we said in *United States v. Perez*, 5 Cir. 1973, 489 F.2d 51, 62: "If that agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, then such agreement constitutes a single conspiracy." We hold that a jury could find that such an agreement existed in this case and that it constituted a single conspiracy. Solomon, Sokolow, and others made separate purchases, which must be expected in any conspiracy of this sort, but that was part of the scheme.

Solomon did not argue specific prejudice to him as a result of the alleged two conspiracies. Not every variance constitutes prejudicial error; the appropriate inquiry is whether a variance "'affect[s] the substantial rights' of the accused". *United States v. Canales*, 5 Cir. 1979, 596 F.2d 664, 670, citing *Berger v. United States,* 1935, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314. "The evaluation of a claim of variance . . . involves application of a two-step analysis: First, to ascertain whether there was in fact a variance between indictment and proof, and second, to determine whether the variance was prejudicial." *United States v. Canales, supra,* at 670–71.

"It may generally be conceded that the possibility of prejudice resulting from a variance increases with the number of defendants tried and number of conspiracies proven". *Bertolotti,* 529 F.2d at 156. In that case there were 29 defendants and an additional 31 unindicted co-conspirators. "Numbers are vitally important in trial, especially in criminal matters". *Kotteakos,* 328 U.S. at 772, 66 S.Ct. at 1251. In that case there were 32 indicted and four more were named as unindicted co-conspirators; 19 proceeded to trial; 13 were left when the

case was tried. In *Berger,* the defendants were charged with a single conspiracy to utter counterfeit notes, but the evidence tended to show two conspiracies. Only four defendants were tried. The Court held that the variance was not such as to "affect the substantial rights of the accused". 295 U.S. at 83, 55 S.Ct. at 631. As the court pointed out in *Bertolotti* : "Indeed, the major distinction between the Supreme Court's finding of no prejudice in *Berger* and its contrary conclusion in *Kotteakos* was the difference in the number of defendants and conspiracies". 529 F.2d at 156.

While we recognize that the question of prejudice is not solely determined by the number of conspirators and conspiracies, on the record before us we cannot hold that the danger of spillover associated with the single/multiple conspiracy problem was so great as to confuse the jury. At trial there were only three defendants and the evidence as to each was clear and distinct. There were only six thefts and the evidence was clear as to the time of each theft and the goods stolen and sold. There was no reason for the jury to become confused and fail to consider each defendant's guilt independently on the evidence against him and in the light of the trial judge's instructions.

Here the alleged variance did not cause failure of adequate notice that might have hindered Solomon's preparing his defense. The charges were not so imprecise as to prevent the defendant pleading double jeopardy in a second prosecution. The variance, if any, did not affect the substantial rights of the defendant.

We AFFIRM the district court's ruling denying Solomon's motion for a judgment of acquittal at the close of the Government's case.

### III.

We turn now to the issues Sokolow raises on appeal.

### A.

The alleged conspiracy for which Sokolow was convicted operated from early 1975 through early 1977. The indictment was not returned until June 9, 1980. Sokolow contends this pre-indictment delay was so prejudicial as to deprive him of due process.

Such a span of time is not per se sufficient to sustain a dismissal of the indictment based upon a claim of pre-indictment delay. The yardstick for measuring the constitutionality of pre-indictment delays is the due process clause, not the speedy trial clause, which governs delays after indictment. *United States v. Marion,* 1971, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468. To establish that a pre-indictment delay violated his due process rights, a defendant must show (1) that he was actually prejudiced by the delay in preparing his defense, and (2) that the delay was unreasonable. *United States v. Lovasco,* 1977, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752, *reh. denied,* 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164; *United States v. Parker,* 5 Cir. 1978, 586 F.2d 422, *reh. denied,* 1979, 590 F.2d 333, *cert. denied,* 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067; *United States v. Shaw,* 5 Cir. 1977, 555 F.2d 1295; *United States v. Surface,* 5 Cir. 1980, 624 F.2d 23.

Because a due process standard is involved, it appears that the prejudice shown must be such as to impair the fairness of the trial. *Marion, supra.* For example, this Court has said that the motivations behind the delay must violate "fundamental conceptions of justice", or a sense of "fair play" or "decency". *Parker, supra; Shaw, supra.* Some cases in the Fifth Circuit have even stated that this requires a showing of deliberate delay to gain a tactical advantage. *United States v. Willis,* 5 Cir. 1978, 583 F.2d 203; *United States v. Catano,* 5 Cir. 1977, 553 F.2d 497, *cert. denied,* 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140; *United States v. Butts,* 5 Cir. 1975, 524 F.2d 975. In cases enunciating this principle, however, the Court has always either found the threshold prejudice requirement unsatisfied or examined the prosecutor's reasons for the delay and approved them. *See Lovasco; Shaw; Catano; Butts; supra.* One case has held that although a showing of deliberate delay is not required, the appropriate

standard of review is to balance the government's legitimate interests in delay against the resulting prejudice. *United States v. Brand*, 5 Cir. 1977, 556 F.2d 1312, 1317 n.7, *cert. denied*, 1978, 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763; *reh. denied*, 435 U.S. 961, 98 S.Ct. 1593, 55 L.Ed.2d 811. The standard is a high one. The defendant has cited no case, and we have found none in this circuit, in which it was met.

To make a showing of prejudice, Sokolow argues that while the government was delaying an indictment, his motel suffered a fire in which exculpatory records were destroyed. He asserts that his records would have shown how little merchandise he bought from Collum, how much he paid, and how the price compared with what he paid legitimate vendors. He also argues that the destroyed records would have shown when and how he first met Collum.

▪ When a defendant asserts prejudice because of the loss of evidence, he must show that the loss impaired his ability to provide a meaningful defense. *United States v. Cederquist*, 9 Cir. 1981, 641 F.2d 1347. The government argues that Sokolow's defense was not impaired because he testified as to the amount, cost, and comparative costs of goods purchased from Collum. The existence of the records is not supported by any testimony; his purchases were made with cash, paid to others as well as to Collum. As to Sokolow's first meeting with Collum, the government argues that Sokolow's motel registration records could show when Collum stayed there, but would say nothing about whether this was the first meeting and nothing about the circumstances of the first meeting. Moreover, Sokolow could have, but did not have his daughter testify on this point, although he testified that she was present at the meeting.

▪ Even if Sokolow had made the necessary showing of prejudice—we do not think that he has—he has not demonstrated that the delay was for the purpose of giving the government a tactical advantage. The government asserts that the delay was attributable in part to good faith confusion on the venue question as to where to prosecute the matter and on what charge. More importantly, the delay was also attributable to the time involved in seeking corroborative evidence and in determining which cases to prosecute against approximately thirty individuals. Collum was arrested February 2, 1977 in connection with the theft of a truckload of goods. Two weeks later he communicated with FBI agents and agreed to cooperate with them. Collum met frequently with the agents and gave them information about some 20 to 30 thefts and the disposition of the stolen goods. This information resulted in an extensive investigation that continued into 1980 and required thoughtful filtering to determine which thefts to prosecute and which to support with additional evidence. Certainly, a prosecutor need not seek an indictment until he is satisfied that he can prove guilt beyond a reasonable doubt. *Shaw, supra.* Balancing the unavoidable delay incident to these reasonable concerns involved in the evaluation of the facts and the law against the minimal prejudice to the defendant in this case, we conclude that there is no basis for dismissal of the indictment under the due process clause.

### B.

▪ Sokolow contends that the district court erred in refusing to admit, for impeachment purposes, evidence that Collum had been convicted of larceny of an automobile in 1959, when he was sixteen years old, and larceny of a truck a year later.

Rule 609(b) of the Federal Rules of Evidence prohibits the admission of evidence of past convictions for impeachment purposes, if the convictions are more than ten years old, "unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect". The language of this rule creates a strong presumption against the admissibility of state convictions, and gives the trial court wide discretion to admit or reject them in evidence.

This Court has stated that evidence of convictions more than ten years old may be admitted only in "exceptional circumstances". *United States v. Cathey*, 5 Cir. 1979, 591 F.2d 268, 276. Although *Cathey* involved the admissibility of convictions of a defendant, rather than of a witness, the Court did not emphasize this factor, and we consider that this difference does not distinguish the case from the case before the Court. Prejudice to the defendants, of course, is a major factor in the balancing process. In *Cathey*, this court held that when the witness has already been impeached by recent convictions, contradictions, and misstatements, no "exceptional circumstances" exist justifying admission of ten-year old convictions. Here, Collum admitted having three felony convictions against him and the record shows that Sokolow's counsel was given wide latitude in cross-examining Collum concerning his admission of more than 20 thefts or hijackings of trucks, use of guns in armed robbery and hijackings, use of false names, sale of stolen goods, lying to law enforcement authorities, and at least three kidnappings. The defendants' attorneys also brought out that according to their estimates he was subject to from 500 to 1,000 years of imprisonment but had plea-bargained with the Government. This was a man well impeached without benefit of stale convictions.

Sokolow also points out that during the Government's direct examination of Collum, the witness denied committing any acts whatsoever relating to the theft of trucks or other vehicles before he met John Purvis in 1975, although the government had evidence to the contrary. In contradiction of this testimony, the defense proffered official FBI "rap sheets", which had been provided by the Government as part of discovery material, clearly reflecting Collum's early convictions in 1959 and 1960. The trial court, based on Rule 609, sustained the government's objection to this evidence. It is arguable that the evidence might have been admissible as impeachment by contradiction, assuming that it was not "collateral", but Sokolow made no such argument and the admissibility would still have been

governed by the discretionary balancing process involved in Rule 403. *See* 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 607[5] at 607–67 & cases cited in n.24. Giving the United States Attorney the benefit of the doubt, we assume that because of the inadmissibility of stale convictions he felt that they could be treated as non-existent.

We accept the validity of Sokolow's assertion that when the testimony of a single witness could well be determinative of one's guilt or innocence, the credibility of such a witness becomes a crucial issue. But Collum's credibility was a crucial issue, and there was ample evidence in the record for the jury not to believe a word he said. The jury chose to believe him when he took the stand, and we cannot go behind that determination of his credibility. We hold that Sokolow was not prejudiced by the district court's refusal to admit the rap sheets and Collum's 1959 and 1960 convictions.

## C.

Sokolow's lawyer asked him the following questions at trial:

1. "[W]hat does your family consist of?"
2. "[H]ave you previously been a member of the armed forces?"
3. "[T]ell us, sir, how and when you acquired the Sunny Isles Motel?"

The court sustained the government's objections to all three questions.

At a side bar conference, the district judge ruled that Sokolow could testify about his experience in the operations of his business, but could not testify that he had been in the armed services and how many children he had, for those matters were irrelevant. Sokolow's counsel stated that he asked the questions to elicit testimony to "demonstrate his [Sokolow's] life-style activities whether living good, whether he has been a respectable citizen." Later, however, Sokolow did testify, without objection, as to how long he had owned his business and how he operated it.

Sokolow argues on appeal that these questions, answers to which were ruled in-

874

admissible, were intended to elicit relevant evidence of his credibility and his character. To the extent credibility bears on truthfulness, the credibility contention is meritless; none of the evidence Sokolow sought to introduce bears on truthfulness. Sokolow relies on *United States v. Latin*, 2 Cir. 1943, 139 F.2d 569, as authority for the idea that when a defendant takes the stand his credibility becomes an issue and he may offer evidence on it. *Latin* was decided before adoption of the Federal Rules of Evidence, and is therefore not controlling. The language Sokolow relies on in *Latin* was pure dictum. The admission of credibility evidence was not challenged in *Latin*; the court held that it was not error to exclude evidence of moral character. In any case, evidence of character is admissible "only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise". Fed. R.Ev. 608(a)(2). Sokolow does not assert that the government tried to attack his character or reputation for truthfulness.

Sokolow cites *Michelson v. United States*, 1948, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, for the general proposition that a defendant may introduce character evidence to allow the jury to infer that the defendant would not have been likely to commit the offense charged. But *Michelson*, like *Latin*, was decided before the adoption of the Federal Rules. It is also inapposite, holding only that extensive cross-examination of a character witness is permissible. In fact, *Michelson* supports the government in this case, because it emphasizes, in dicta, two of the government's key arguments: (1) character evidence must be in the form of "opinion or reputation" testimony, Fed. R.Ev. 405(a); (2) Courts of Appeals will overturn trial courts on questions involving character evidence only for prejudicial abuse of discretion, 335 U.S. at 477, 69 S.Ct. at 219. *See also United States v. Davis*, 5 Cir. 1977, 546 F.2d 583, 592, *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391; *United States v. Trollinger*, 5 Cir. 1969, 415 F.2d 527, 529.

The Federal Rules of Evidence provide that character may be proved by "specific instances of conduct" only on cross-examination or where the "character or a trait of character is an essential element of a charge, claim, or defense". Fed.R.Ev. 405(a), (b). Otherwise proof must be by reputation or opinion. The questions were not intended to elicit relevant testimony as to reputation or opinion, and they referred to specific instances of conduct. In fact, Sokolow did not proffer any character witnesses nor did he request a jury instruction dealing with character evidence. The district court, however, did allow considerable latitude to Sokolow in presenting germane background information on his business, its operation over the years, and his working habits and practices.

 The trial judge is given broad discretion in ruling on the admissibility of character testimony. As such, the applicable standard of review of a district court's exercise of its discretion in excluding character evidence is set out in *United States v. Trollinger*, 5 Cir. 1969, 415 F.2d 527, 529:

The general rule is well established that rarely and only upon a clear showing of prejudicial abuse of discretion will appellate courts disturb the rulings of trial courts in the matter of character evidence testimony.

*Accord, United States v. Davis*, 5 Cir. 1977, 546 F.2d 583. We hold that the trial judge did not abuse his discretion in sustaining the government's objection to Sokolow's testimony.

### D.

Finally, Sokolow contends that the district court erred in refusing to instruct the jury specifically on the essential elements of criminal conspiracy and in denying a requested jury instruction.

The district court instructed the jury that the defendants were charged with having

willfully and knowingly combined, conspired and agreed together to violate one or more laws of the United States, including Title 18, Sections 659, and 2315, all in violation of Title 18, Section 371, United States Code.

He also instructed the jury as to the essential elements of §§ 659 and 2315, which concern knowing possession of stolen goods, and of § 371, which concerns conspiracy to violate the laws of the United States. The court did not mention in its charge, or elaborate the essential elements of, 18 U.S.C. §§ 2313 and 2314, which concern transportation of stolen goods and theft of vehicles.

First, Sokolow asserts that the instruction was erroneous in that the court's use of the words "one or more laws" and "including" impermissibly left the jury to speculate about what crime was being submitted to it to resolve. Second, he argues that the court's failure to discuss the elements of §§ 2313 and 2314 constituted impermissible failure to specify the elements of the crime charged. And third, he contests the court's refusal to charge the jury that the relationship of buying and selling does not prove a conspiracy. None of these contentions has merit.

In arguing that the specific language of the instruction allows the inference that unmentioned, nonspecific crimes are being charged, Sokolow relies on *Williamson v. United States*, 5 Cir. 1964, 332 F.2d 123. In that opinion the Court stated that "the jury should not be permitted to speculate on what crime is being submitted to them to resolve or what the contents of each such crime might be". We do not quarrel with that statement. But the impermissible charge in *Williamson* was very brief, and included reference to specific crimes, the elements of which it did not discuss. There was thus a realistic danger of the jury's playing guessing games. The instructions in the present case create no such danger. In this case the trial judge gave a long and detailed charge, a copy of which was given to the jury after the oral charge was given. This, of course, was to have the benefit of the jury's listening to the oral charge, and then have the written charge available for the jury to read.

As the government argues, jury instructions must be taken in context, as part of a whole, and interpreted with common sense.

A jury, in hearing and reading a long and detailed instruction, would hardly single out words like "one or more" or "including" and use them as a basis for inferring that additional crimes were being charged. Sokolow's parade of horribles, for example, that the jury might think he was charged with "treason, extortion, tax evasion, et cetera", is divorced from reality.

Second, Sokolow contends that the trial court's failure to discuss two of the four offenses listed in the indictment constituted a failure to specify the elements of the crimes charged. When the indictment alleges a criminal conspiracy to violate several offenses against the United States, it is sufficient to prove that the defendant conspired to accomplish only one of these offenses. *United States v. James*, 5 Cir. 1976, 528 F.2d 999, 1014, *rehearing denied*, 532 F.2d 1054, *cert. denied*, 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). *See United States v. Maddox*, 5 Cir. 1973, 492 F.2d 104, 106, *cert. denied*, 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974). Here, the trial court did properly instruct on the four essential elements of criminal conspiracy.[4] And the trial court properly focused the jury's attention on those offenses against the United States which the evidence showed had been violated by the defendants. The omission of direct reference to two offenses had no effect on the two remaining charges of criminal conspiracy. *See generally United States v. Musgrave*, 5 Cir. 1973, 483 F.2d 327, 328. *United States v. Bosch*, 5 Cir. 1974, 505 F.2d 78, requires no different result. In *Bosch* the judge used faulty special interrogatories, which clearly allowed for conviction when all the elements of a crime had not been proved. The instructions in the instant case were sufficient to apprise the jury fairly and adequately of the law to be applied. *See United States v. Goldberg*, 9 Cir. 1972, 455 F.2d 479, 480, *cert. denied*, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 665.

Third, Sokolow contends that the trial court erred in refusing to give his

4. See footnote 2.

proposed instruction. He relies on *United States v. Varelli*, 7 Cir. 1969, 407 F.2d 735, 748, which held that the relationship of buying and selling is not enough to establish a conspiracy; *accord, United States v. Ford*, 7 Cir. 1963, 324 F.2d 950.[5] As the government points out, however, a trial court should not be reversed for refusing to give a particular instruction, as long as the instruction it does give "correctly states the substance of the law" and adequately addresses the defendant's concerns. *United States v. L'Hoste*, 5 Cir. 1980, 609 F.2d 796, 805, *reh. denied*, 615 F.2d 383, *cert. denied*, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39.

■ There is no doubt, as *Varelli* says, that the act of buying stolen goods, even goods known to have been stolen, standing alone, does not make the purchaser a member of a conspiracy to steal the goods or to receive stolen goods: The purchase takes place after the theft, it may be a single isolated transaction, and has no necessary relation to the commission of the crime. But if the purchaser was part of an ongoing scheme in which he had an agreement/understanding with the core conspirators to buy the stolen goods and resell them discreetly to raise the money to pay for the goods, or consume all or part of them, there is something more than a simple purchase. In that situation the thief, the broker, and the fence interact, each with his own contribution to make toward accomplishment of a common plan.

In *United States v. Mancillas*, 7 Cir. 1978, 580 F.2d 1301, 1307, the Court stated the correct principle:

Because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction. . . .

The relationship of buyer and seller *absent any prior or contemporaneous understanding* beyond the mere sales agreement does not prove a conspiracy to sell, receive, barter or dispose of stolen property although both parties know of the stolen character of the goods. In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective. *United States v. Ford*, 7 Cir. 1963, 324 F.2d 950, 952 (emphasis added).

In *Mancillas* the Court then went on to point out evidence, somewhat similar to the evidence in the record before us, showing that the defendant's purchase was part of a conspiracy:

The Government offered evidence from which the jury could properly have found that several phone calls were made by Mancillas to Aveytia prior to the incidents in Chicago, that Mancillas went to El Paso and met with Aveytia, that Mancillas and Aveytia had in fact checked into the Holiday Inn West motel together on July 2, 1976, that on Aveytia's arrival on July 18 he promptly telephoned Mancillas' residence, and that soon thereafter Mancillas joined Aveytia at the motel to effect distribution. From all of these facts, the jury could reasonably have concluded that Mancillas and Aveytia had an ongoing relationship in the distribution of heroin, or that at least they had prearranged the interstate transportation of heroin for distribution in Chicago, or both. Either conclusion would support a determination that there was a prior understanding with a common purpose.

■ Sokolow's proposed instruction was an incomplete statement of the law and would have confused the jury. The Government did not contend that "the relationship of buying and selling" proved a conspiracy nor that "knowledge of the un-

---

5. In *Varelli*, the Court, citing *United States v. Ford*, 324 F.2d 950, said that "the acts of buying and selling of stolen goods without further agreement does not constitute the crime of conspiracy. . . .

Saletko, Infelice, Legato and Gallo were, at most, purchasers of stolen Polaroid equip-ment. Each took part in only one single transaction as part of the distribution of the entire truckload of Polaroid cameras and film. There was no evidence of any further agreement, and, therefore, they cannot be charged with conspiracy."
407 F.2d at 748.

lawful nature of the goods" proved that Sokolow was a member of the conspiracy. The act of buying and selling may or may not be evidence of a conspiracy. The key factor is the knowledge and understanding of the parties associated with the buying and selling. It is the absence of any prior or contemporaneous understanding that makes a mere agreement to buy and sell insufficient to establish a conspiracy. Consequently, the act of buying and selling, preceded by or coupled with a contemporaneous agreement, can itself be evidence of the conspiracy.

The trial judge made it clear that there must be more than the relationship of buyer and seller. He concentrated on the crux of the conspiracy—the agreement or prior understanding. He charged:

> What the evidence in the case must show beyond a reasonable doubt, in order to establish proof that a conspiracy existed, is that the members in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.
>
> * * * * * *
>
> Before you may find that a defendant, or any other person, has become a member of a conspiracy, the evidence in the case must show beyond a reasonable doubt that the conspiracy was knowingly formed, and that the defendant, or other person who is claimed to have been a member, willfully participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy.

The necessity of proving "a mutual understanding" to "accomplish a common and unlawful plan" is the element omitted from the instruction Sokolow proposed.

To make doubly sure that the jury would draw no false inference, the trial judge instructed the jury:

> However, mere presence at the scene of an alleged transaction or event, or mere similarity of conduct among various persons, and the fact that they may have assembled with each other, or assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.

Jury instructions are to be viewed as a whole. *United States v. Welsh*, 5 Cir. 1969, 417 F.2d 361. We hold that the trial judge's instructions properly stated the substance of the law. He did not err in declining to give defendant Sokolow's proposed instructions.

We AFFIRM the district court's judgments as to both the appellants, Solomon and Sokolow.