UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Bobby BENSON, a/k/a
Kojo, Appellant.

No. 86–5817.

United States Court of Appeals,
Eleventh Circuit.

June 14, 1988.

Paul A. McKenna, Miami, Fla. (Court-appointed) for appellant.

Leon B. Kellner, U.S. Atty., Mayra R. Lichter, Sonia E. O'Donnell, Linda C. Hertz, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before FAY and VANCE, Circuit Judges, and HOFFMAN *, Senior District Judge.

WALTER E. HOFFMAN, Senior District Judge:

On January 14, 1978, Custom's agents detained appellant Charles Bobby Benson at the Los Angeles International Airport after finding heroin inside two bronze statues located in Benson's luggage. Benson told agents of the Drug Enforcement Agency (DEA) that he knew nothing about the heroin. Benson explained that he was a member of a band and had just finished a tour of Asia which had included performances in Bangkok, and concluded with a performance in London. Benson told the agents that the group visited Africa after the tour where the managers of the band purchased several boxes of African artifacts, including the bronze statues. Ac-

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

cording to Benson, he decided to leave Africa early and the band managers, "Rich" and "John," asked Benson to take two bronze statues back to America where they would pick them up on January 20, when the band returned to the United States.

The DEA persuaded Benson to help make a controlled delivery of the statues in an effort to apprehend Rich and John. On January 17, Benson reported to the DEA that Rich had contacted him and had asked Benson to take the statues to Lansing, Michigan. Benson explained that he expected another call from either John or Rich. Consequently, agents of the DEA installed a recording device on Benson's phone. Neither Rich nor John called and, after five days, the device was removed. On January 28, after the DEA had removed the recording device, Benson claimed he received a call from John who had instructed Benson to deliver the statues to 8440 Sunset Boulevard. The DEA set up a controlled delivery, but no one showed up at the Sunset Boulevard address to pick up the statues. The government decided not to indict Benson because the prosecution felt that the evidence was insufficient to link Benson to the smuggling operation.

On April 28, 1978, DEA agents found a heroin filled suitcase in the possession of Reginald Gary Davis at the Miami International Airport. Davis denied knowledge of the heroin and explained to DEA agents that he was simply delivering the suitcase to a man named "Rich" at 8440 Sunset Boulevard in Los Angeles, California.[1] Gil Charette, an agent of the DEA, picked up on the fact that both Benson and Davis gave 8440 Sunset Boulevard as the address to which they were to deliver heroin. Upon further investigation, Charette discovered evidence of phone contact between Davis and Benson. Charette found no other evidence linking Benson and Davis and decided not to proceed with an indictment at that time.

A few months later, in October of 1978, authorities caught Brenda Joyce Gollman smuggling heroin out of London. Gollman told authorities that she was a drug courier making a run for Reginald Gary Davis. She stated that a man named "Thomas," also known as Cojo, had given her the drugs in London. Gollman identified appellant Benson through a photograph as the man called "Cojo" from whom she had received the heroin.

Agent Charette reported the connections between Davis, Benson and Gollman to the United States Attorney in Los Angeles who in turn indicted Benson in February of 1980. Benson responded with a motion to dismiss for pre-indictment delay, but before the court ruled on the motion, the government moved to dismiss the indictment, presumably under Rule 48(a) of the Federal Rules of Criminal Procedure. The government then closed the case and destroyed the evidence that they had accumulated in connection with the case.

Four years later, in August of 1984, agents of the DEA in Miami were trading "smuggling" stores when they realized that several of their stories involved the same man—DeWright Johnson of Detroit. The DEA found that it had quite a bit of collective information on Johnson and thus began an investigation of his smuggling activities. DEA agents flew to Thailand and deposed Louis Browne who testified that he was the interpreter for Johnson in several drug transactions. Browne testified that he remembered the suitcase found in Davis's possession, and that he knew the suitcase was going to Bangkok, then to Jamaica where a man named Dennis Bronson, later identified as Davis, was to carry the suitcase to Detroit. Brown testified that, while he, Browne, was apprehended on drug charges in February of 1981, Johnson kept dealing in heroin through a man named Montree Zeemakorn, until as late as October of 1981.

The DEA in the Southern District of Florida turned the evidence over to a federal grand jury, who returned a two-count indictment against the appellant Benson along with several other co-conspirators on December 20, 1985. Count One charged conspiracy to import heroin and count two

---

1. Davis was tried and acquitted on drug related charges.

charged conspiracy to possess heroin with intent to distribute. Benson moved to dismiss the indictment based on the government's pre-indictment delay. After an evidentiary hearing, the district court denied Benson's motion. Following a jury trial, Benson was convicted on both counts and sentenced to five years in prison. Benson appeals the district court's denial of his motion to dismiss the indictment for pre-indictment delay.

■ Benson argues that the eight-year delay from the commencement of the government's investigation in early 1978 until the rendering of the indictment in late 1985 violated his Fifth Amendment right to due process. At first glance we are tempted, as was the trial judge, to "take a conclusive presumption that [prosecution for] anything eight years old is a violation of the Constitution." *But see Stoner v. Graddick,* 751 F.2d 1535, 1544 (11th Cir. 1985) (courts should not presume prejudice because of lengthy pre-indictment delay). The question that immediately comes to mind is "Why doesn't the statute of limitations bar prosecution in this case"? The Supreme Court has made clear that "the applicable statute of limitations ... is ... the primary guarantee against bringing overly stale criminal charges." *United States v. Ewell,* 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). Indeed, the statute of limitations on both crimes for which Benson was convicted is five years. The government, however, has stretched the limitations period considerably by tying Benson to DeWright Johnson's drug smuggling activities. While the government presents no evidence that Benson's overt acts extended beyond 1978, the conspiracy in which Benson participated stretched into October of 1981. Since the government alleges that Benson was a player in Johnson's overall conspiracy, the

statute of limitations on his crime did not begin to run until 1981 when DeWright Johnson and Montree Zeemakorn committed the last overt act of the conspiracy. In short, as long as the conspiracy with which Benson was involved continues, the statute of limitations on Benson's participation in that conspiracy, however remote in time, never begins to run. The five year statute of limitations on Benson's crimes is a specific limit "beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *See United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). But because of the nature of Benson's crime, the five-year statute of limitations, in effect, does not apply.

We must now determine whether the eight-year delay nonetheless prejudiced the defendant's right to a fair trial.[2] Fortunately, the Supreme Court has provided a mechanism for making that determination. In *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Supreme Court addressed the due process implications of an eighteen month delay between the offense and the indictment. Justice Marshall, writing for an eight member majority, made clear that proof of actual prejudice is necessary before a defendant can prevail on a motion to dismiss for pre-indictment delay. The Court emphasized, however, that "the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." *Id.* at 790, 97 S.Ct. at 2049. In *Lovasco,* the delay was a result of the "prosecution's ongoing investigation." The Court held that "investigative delay is fundamentally unlike delay undertaken by the government solely 'to gain tactical advantage over the accused.'" *Id.* at 795, 97 S.Ct. at 2051 (quoting *Marion,* 404 U.S. at

---

**2.** This court in *Stoner v. Graddick,* 751 F.2d 1535 (11th Cir.1985) noted that:

> Only where the applicable statute of limitations has failed to offer relief for pre-indictment delay, are claims for actual prejudice in violation of due process clause of the Fourteenth Amendment ripe for judicial consideration.

*Id.* at 1541. Thus, if the appellant can show actual prejudice, then his claim of a due process violation is certainly ripe for consideration in light of the eight year delay between his participation in the alleged crime and the rendering of the indictment.

324, 92 S.Ct. at 465).[3] Since the delay in *Lovasco* was investigative, the Court found no due process violation.

■ The Eleventh Circuit has seized upon the language in *Marion* and *Lovasco* concerning a delay to gain a tactical advantage, and established a two-pronged test to determine when pre-indictment delay violates due process. In this Circuit, to succeed on a motion to dismiss an indictment for pre-indictment delay, a defendant must show 1) that the delay caused actual prejudice to the conduct of his defense and 2) that the delay was the product of deliberate action by the government designed to gain a tactical advantage.[4] *United States v. Caporale*, 806 F.2d 1487, 1514 (11th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1986); *United States v. Butler*, 792 F.2d 1528, 1533 (11th Cir.), *cert. denied*, *Waites v. United States*, — U.S. —, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986); *Stoner v. Graddick*, 751 F.2d 1535, 1543 (11th Cir.1985); *United States v. Lindstrom*, 698 F.2d 1154, 1157–58 (11th Cir.; *United States v. Solomon*, 686 F.2d 863, 872 (11th Cir.1983); *United States v. Willis*, 583 F.2d 203, 207 (5th Cir.1978).

To support his motion to dismiss, Benson cites several specific instances of alleged prejudice resulting from the delay. First, Benson claims that the delay hinders him from supporting his alibi with the testimony of two individuals who are now unavailable. In his defense, Benson claims that he was in Los Angeles participating in the Islamic holy month of Ramadan during the entire month of August in 1978. The government charges that Benson was in London at that time, delivering heroin to Gollman. Benson maintains that two witnesses, Dr. Vadar, who was the director of the Los Angeles Islamic Center, and Hassan Toury, a worker at the center, would testify to his presence at the center during the entire month. The government claims that, since over 1,000 people attended the Islamic center each night during the month of Ramadan, Benson did not need these specific witnesses to corroborate his alibi. The government further maintains that there is no evidence suggesting that the two lost witnesses would remember Benson or testify to his presence at the Islamic center.

Benson argues that he was also prejudiced by the death of DEA Agent Steven Chelsea who allegedly would testify that he believed Benson's story when Chelsea detained Benson at the Los Angeles Airport back in 1978. Benson further claims prejudice because the evidence of his cooperation with Agent Chelsea was destroyed. The government, however, points out that no one takes issue with Benson's coopera-

**3.** The Supreme Court in *United States v. Marion* noted:

> [T]he government concedes that the due process clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellee's rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.

*Marion*, 404 U.S. at 324, 92 S.Ct. at 465. The Court in *Marion*, however, specifically refused to determine "when and in what circumstances actual prejudice resulting from pre-accusation delays requires dismissal of the prosecution." *Id.*

The Court in *United States v. Lovasco* notes that the government renewed and expanded its concession by writing in its brief:

> A due process violation might also be made out upon a showing of prosecutorial delay

incurred in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.

*Lovasco*, 431 U.S. at 795 n. 17, 97 S.Ct. at 2051 n. 17. The Court, however, did not address the issue as there was no evidence of recklessness.

**4.** In *Stoner v. Graddick*, 751 F.2d 1535 (11th Cir.1986), this circuit suggested that the Supreme Court in *Lovasco* and *Marion* "strongly hinted that bad faith was a necessary component of a successful due process challenge." *Id.* at 1542. The court then noted that "indeed, this circuit has so interpreted *Marion* and *Lovasco*," and that we are bound by the thrust of this precedent. *Id.* The court in *Stoner* addresses extensively the alternative "balancing" test that has crept into a few Fifth and Eleventh Circuit opinions. *See id.* at 1542 n. 4.

tion with the DEA. As to Chelsea's opinion on Benson's story, the government contends that such opinion testimony is irrelevant and inadmissible.

Benson claims that he is prejudiced because, since the investigation began, he has lost his passport which would establish his route of travel during the alleged conspiracy. He particularly stresses that the passport would show that he was in Japan in December of 1977. The government notes that the prosecution provided Benson with a receipt indicating that he had stayed at a Tokyo hotel in December. Thus, the government contends, the passport is unnecessary.

Benson claims that, over the years, artifact documents required by the Ghanian government have been lost. These documents, Benson claims, would cooberate his exculpatory statements concerning the heroin filled statues. The government maintains that there is no evidence that such documents ever existed.

When detained in Los Angeles in 1978, Benson prepared a list of members in his band for the DEA. The government, however, never located any listed members. Benson maintains that the list, which now is lost, would show that the government inverted the first and last names thereby rendering the list useless. The government simply states that this claim of prejudice was not presented at the evidentiary hearing.

When Gollman was arrested in London, she identified Benson through a photograph as the man from whom she had received the heroin she was smuggling. Of course, this photo is unavailable today. Benson claims, without saying why, that the loss of the photo has prejudiced him. The government notes that Gollman had met Benson in Los Angeles before the London heroin transfer. Consequently, the government maintains, the photo identification could not be a mistake.

After an evidentiary hearing, the court below, while conceding that this is a close case, denied Benson's motion for dismissal. The court found that the loss of witnesses caused "some degree of prejudice" but that the prejudice did not rise to "the constitutional level prohibited or demanded by our Constitution." The court further found that the lost testimony would be cumulative, as others could testify to the same thing. The court found that the appellant had not shown that the lost passport could not be found with due diligence. The court noted, however, that even if the passport could not be found, any prejudice resulting from its loss "is of such an insignificant nature as not to warrant the draconian step of dismissal." The appellant did not assert his other claims of prejudice at the evidentiary hearing. Consequently, the court made no findings as to these claims.

■ Benson certainly was prejudiced by the government's delay in indicting him in this case. We agree with the trial judge, however, that the prejudice does not rise to constitutional proportions. Every day that passes after an allegedly criminal act occurs will probably hinder a defense to some degree. But any prejudice asserted by a defendant must be balanced against the government's need for an investigative delay. *United States v. Brand,* 556 F.2d 1312, 1317 n. 7 (5th Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978). When balanced against a valid, investigative delay, the prejudice asserted by Benson certainly does not offend "fundamental conceptions of justice." *Lovasco,* 431 U.S. at 790–91, 97 S.Ct. at 2049. But the delay in this case was not investigative. On the contrary, by the government's own admission, at least half of the delay was caused by pure negligence. Thus, we must determine whether a negligent delay causing minor prejudice to the appellant's defense violates the appellant's due process rights. Under the standard adopted in this circuit, we find that the trial court properly denied the appellant's motion for dismissal based on pre-indictment delay.

Under the standard first used in *United States v. Solomon,* 686 F.2d 863, 872 (11th

Cir.1983), and since used consistently in this circuit, to prevail on a due process claim, the defendant must show that any delay by the government not only caused actual prejudice, but that the prosecution "deliberately caused the delay to gain any tactical advantage." *United States v. Caporale*, 806 F.2d 1487, 1514 (11th Cir. 1986).[5] In the instant case, the appellant has failed to show that the government deliberately delayed rendering the indictment in order to gain a tactical advantage over the defendant. The record of the evidentiary hearing shows that the delay was pure negligence. Indeed, the government destroyed all of the evidence against Benson when the first indictment was dismissed back in 1980. Consequently, the government had to build its case from scratch in 1984. Clearly, the delay cannot be attributed toward the government's deliberate attempt to gain an advantage. The record here shows no "bad faith" on the part of the government—a necessary component of a successful due process claim under the "binding precedent of this circuit." *Stoner*, 751 F.2d at 1542; see note 3, *supra.*

AFFIRMED.

---

**5.** The Supreme Court in both *Lovasco* and *Marion* made clear that any delay brought about by the need for further investigation would not give rise to a due process claim. *Marion*, 404 U.S. at 324, 92 S.Ct. at 465; *Lovasco*, 431 U.S. at 795, 97 S.Ct. at 2051. The Court, in both cases, however, refused to discuss in the abstract reasons for delay that might give rise to a constitutional challenge. In *Marion*, the Court notes the government's concession that a delay to gain a tactical advantage might give rise to a due process claim. *Marion*, 404 U.S. at 324, 92 S.Ct. at 465. In *Lovasco*, the Court notes that the government's concession was expanded to include reckless delay. *Lovasco*, 431 U.S. at 795 n. 17, 97 S.Ct. at 2051 n. 17. This circuit has adopted the government's concession in *Marion* as the second prong of its test to determine a due process violation from investigative delay. We, of course, are bound by the precedent in this circuit. See footnote 3, *supra.*