**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Nemencio CANALES, Benito Canales, Eduardo Vasquez[1] and Juan Torres-Alaniz, Defendants-Appellants.**

**No. 78–5410.**

United States Court of Appeals,
Fifth Circuit.

June 6, 1979.

Rehearing Denied July 2, 1979.

---

1. The indictment and trial record spell appellant Vasquez's first name Eduardo; his brief on appeal, however, spells it Edwardo. In this opinion we will refer to appellant Vasquez as Eduardo Vasquez.

John R. Coe, Houston, Tex., for N. Canales and Vasquez.

Bennie E. Ray, Brownsville, Tex., for B. Canales.

Tony Martinez, Brownsville, Tex. (Court-appointed), for Torres-Alaniz.

J. A. Canales, U. S. Atty., James R. Gough, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., John Patrick Smith, Asst. U. S. Atty., Brownsville, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, AINSWORTH and DYER, Circuit Judges.

AINSWORTH, Circuit Judge:

In this criminal appeal each of the four appellants challenges the sufficiency of evidence to support his conviction after a jury trial of various offenses relating to the possession and distribution of controlled substances in southern Texas. Appellant Benito Canales also charges a fatal variance between the indictment and the proof at trial. As we find the evidence sufficient to sustain the convictions and find no prejudicial variance between indictment and proof, the judgment is affirmed as to each of the appellants.

Appellants Nemencio Canales, Benito Canales, Eduardo Vasquez and Juan Torres-Alaniz were all convicted of conspiracy to possess with intent to distribute a quantity of marijuana in violation of 21 U.S.C. §§ 846 [2] and 841(a)(1).[3] In addition, Nem-

---

**2.** 21 U.S.C. § 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

**3.** 21 U.S.C. § 841(a) provides in pertinent part:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

encio Canales and Juan Torres-Alaniz were convicted of possession with intent to distribute of approximately 760 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[4] Nemencio Canales was also convicted of conspiracy to possess with intent to distribute and to distribute a quantity of cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and of six counts of knowingly and intentionally using a communications facility in the commission of a felony in violation of 21 U.S.C. § 843(b).[5]

*Facts:*

The indictment alleged that the conspiracy to possess marijuana with intent to distribute, in which all four appellants were implicated, continued from October 17, 1977 through January 13, 1978. Early in October 1977 undercover narcotics agents Eddie Hebisen and David Hammonds of the Texas Department of Public Safety, stationed in Houston, discussed possible drug deals with Michael Brown, a known drug dealer in the Houston area. On October 17 Brown called the agents from Brownsville, Texas to report that he could procure 1,000 pounds of marijuana for $50,000. The agents went to Brownsville that afternoon and met Brown who introduced them to Andrew Kiah Taylor whose friends had the marijuana.

To make the exchange, Taylor proposed that the agents rent a truck, park it in a parking lot, and give the keys to Brown or Taylor who would take the truck, load it with the marijuana and then return it to the parking lot where they would be paid.

Taylor told the agents to return to their motel room to wait for someone to come count the money. That evening Brown, Taylor and Arturo Moreno visited the agents' room. When Taylor identified Moreno as the man in Brownsville who could get 1,000 pounds of marijuana, Moreno agreed but stated that he first wanted to count the money. Agent Hammonds showed Moreno the $50,000 that the agents had brought for that purpose. Moreno then said that only 500 pounds of marijuana was currently on the Brownsville side of the Mexican border and that it would take a day or so to get the other 500 pounds. Moreno promised to provide a sample and asked the agents to wait patiently.

On the morning of October 19, Brown delivered approximately 4½ pounds of marijuana to the agents and instructed them to rent a truck and to bring the keys to him and Taylor at their hotel. Accordingly, the agents rented a large U–Haul truck, parked it in the parking lot of a local Woolco store and took the keys to Brown and Taylor. Taylor indicated that he and Brown would load the marijuana with Moreno and that the exchange of marijuana and money would take place at Moreno's house in Brownsville. Before returning to their hotel, the agents and Taylor drove past Moreno's house to be sure it was safe and they saw parked there a yellow Mercury station wagon registered to appellant Benito Canales.

At 1 that afternoon Moreno and appellant Eduardo Vasquez visited the agents'

---

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

**4.** 18 U.S.C. § 2 provides:

**§ 2. Principals**
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**5.** 21 U.S.C. § 843(b) provides:

(b) It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

hotel room. Moreno explained that Vasquez was his connection in Brownsville for marijuana and cocaine. Vasquez agreed with this statement and told the agents he could supply the 1,000 pounds of marijuana but needed to count the money again. The agents refused to permit a second counting telling Vasquez that if he did not believe that Moreno had counted the money two nights earlier there could be no further dealings between them. Vasquez acquiesced and told the agents he would call them by 3:30 to verify that all was going smoothly and would deliver the marijuana by 5 that afternoon.

Taylor [6] testified at trial that, while the agents waited at their hotel, he, Moreno and Benito Canales picked up the rented truck at the Woolco parking lot and drove it to Moreno's house where they were to await delivery of the marijuana. Brown [7] who was also at Moreno's house testified that he did not recall Canales' presence at that time. After a wait of several hours Moreno decided between 3:30 and 4 that the exchange could not be made at his house because his brother, a schoolteacher, would be home. It was agreed to move to Benito Canales' house. Taylor testified that he and Brown drove to Canales' house in Brown's car while Moreno and Canales drove the Mercury station wagon and the rented truck. Brown testified that he first met Benito Canales at Canales' house.

A short time after the arrival at Canales' house, an unidentified individual stopped by and told Moreno that the suppliers had been ready to deliver the marijuana but believed that they had seen agents of a local narcotics task force and were, therefore, scared. When Brown asked Canales what was wrong Canales repeated Moreno's statement that the suppliers were nervous. Canales then made several telephone calls after which he confirmed to Brown that the suppliers were not going to deliver the marijuana because they were scared. When it

was decided that the transaction would not be consummated that day, Benito Canales drove the rented truck back to the Woolco lot at Brown's request.

At 7:20 that evening Brown returned to the agents' hotel followed a few minutes later by Moreno and Vasquez. Brown and Moreno went to the agents' room, while Vasquez waited in the parking lot, and Moreno reported that the marijuana was scattered about and could not be assembled that day. Moreno also requested the return of the 4½-pound sample supplied earlier in the day but the agents refused to return it. Brown told the agents that he had been in contact with a man named Benny who might be able to supply the marijuana and that he was going to talk to Benny before calling off the deal. This Benny was appellant Benito Canales. Brown left the agents' room and called shortly thereafter from Canales' house to report that Canales could not get the marijuana either. Canales had made some telephone calls and had told Brown that the suppliers were afraid of the task force.

Brown went to the agents' hotel room for the final time on October 19 at about 9:45 p. m. to suggest that they abandon the transaction for that day. Brown told the agents that he had exchanged telephone numbers with Benito Canales so that Canales could contact him if Moreno's people or somebody else wanted to sell some marijuana. A potential supplier could contact Canales who would either give the supplier Brown's telephone number or call Brown himself, and Brown would then contact agent Hebisen in Houston. Agents Hebisen and Hammonds returned to Houston on October 20.

On or about December 12, 1977, Brown received a telephone call in Houston from a man who identified himself as Carlos Canales and claimed to be a relative of Benito Canales. This man, whose real name was

---

6. Andrew Taylor was indicted for conspiracy to possess marijuana with intent to distribute and pleaded guilty to a criminal information.

7. Michael Brown was indicted for conspiracy to possess marijuana with intent to distribute and for conspiracy to possess cocaine with intent to distribute. He pleaded guilty to the former charge.

Carlos Sauceda, told Brown that Benito Canales had told him to contact Brown to sell some marijuana. Brown met Sauceda at a Holiday Inn in Houston and then called agents Hebisen and Hammonds on December 13 to arrange a meeting. At about 2:45 p. m. on December 13, the agents met Sauceda at the Wayside Inn in Houston; Sauceda showed them a sample of marijuana and told them he could procure from 500 to 1,000 pounds of marijuana and up to 5 pounds of cocaine. He said that his supplier of marijuana and cocaine in Brownsville was appellant Nemencio Canales, who is the brother of Benito Canales. At that time Sauceda gave the agents a telephone number in Brownsville and told them to call any time and to ask for Carlos or Nemencio. Sauceda indicated that anyone who answered the phone would know why they were calling. Carlos said that he would call Nemencio to arrange the sale of 500 pounds of marijuana and a quantity of cocaine.

On December 14, the agents had a second meeting with Sauceda at which he offered to sell 40 pounds of marijuana he had brought with him from Brownsville to Houston. When the agents declined, Sauceda said he would call Nemencio Canales who was supposedly in Brownsville preparing the large quantities of marijuana and cocaine to be brought to Houston. Sauceda told the agents that they would hear from him shortly.

Nothing further transpired until January 3, 1978, when agent Hebisen called the Brownsville telephone number given him by Sauceda. After being told that Carlos did not live there, Hebisen identified himself as "Eddie" and was told to wait. An individual who introduced himself as Nemencio came to the phone and declared that he was the one with the marijuana and cocaine and the man in Brownsville with whom Hebisen had to deal. Nemencio ascertained that Hebisen wanted to do business and promised to call back later. Agent Hebisen testified that, although they had never met, Nemencio seemed to know his name. Nemencio called Hebisen later that day to report that he could sell him 500 pounds of marijuana and an unspecified quantity of cocaine. During this conversation Nemencio stated that he knew Hebisen had been in Brownsville in October to purchase a large quantity of marijuana from some friends and his brother Benny and that he was sorry the deal had not worked out.

At 9 that evening agent Hebisen again called Nemencio who told him that there was a man at his house who would sell 2 pounds of cocaine for $2,000 an ounce if the agent could pick it up in Brownsville or McAllen. On January 4 agents Hebisen and Hammonds went to a motel in McAllen and called Nemencio who said that he and a brother would come to McAllen to count the money. On the morning of January 5 Nemencio called the agents at their motel to tell them that he would arrive alone in an hour and a half to count the money and around 11:15 a. m. appellant Nemencio Canales arrived at the agents' room and introduced himself. He counted part of the $64,000 the agents had brought with them and explained that there was some delay getting the cocaine from his supplier in Guadalajara.

There was no delivery on January 6 and on January 7 Nemencio Canales called agent Hebisen to report that he was unable to procure the cocaine but wanted to know if Hebisen would be interested in purchasing 500 pounds of marijuana. The agent said he would consider the matter and call back. When Hebisen returned Canales' call at about 6 p. m., Canales said that when the marijuana was brought across the border he would take it by truck to McAllen. At 10 that evening Hebisen called Canales and, on learning that the marijuana was still not across the border, decided to return to Houston.

On January 12 agent Hebisen received a call in Houston from Nemencio Canales who offered to sell over 700 pounds of marijuana at $65 a pound and a pound and a half of cocaine at $1,700 an ounce, for a total value of $86,300. Hebisen told Canales that he would be in either McAllen or Brownsville the next day to purchase the drugs.

At 11 a. m. on January 13, agents Hebisen and Hammonds called Canales from McAllen. Canales stated that he had the marijuana and cocaine but no means of transporting them to McAllen and, hence, wanted the agents to rent a truck or van which he would pick up in McAllen, load in Brownsville and then return to McAllen. Hebisen agreed to rent a truck or van and Nemencio Canales said that he and his brother would pick it up at 2:30 that afternoon at the Sheraton Fairway in McAllen. At about 2:20 p. m. the agents met Nemencio and an individual introduced as "Chuey" in the lobby of the Sheraton Fairway; this individual was Jesus Canales, the brother of Nemencio and Benito Canales.

The two agents, Nemencio and Jesus went out to the hotel's parking lot to give Nemencio and Jesus the Ford van rented by the agents. Jesus told the agents that someone named "Juan," who was the man from Mexico with the marijuana, had come to McAllen to count the money. In fact, the agents had no money at this time, so Hebisen told Jesus that, since Nemencio had told him on the telephone that there was no need to count the money until the delivery of the marijuana and cocaine, he would not permit them to count the money. Jesus walked to the black and blue Buick that he and Nemencio had come in and spoke to the passenger in the Buick. He then returned to where the agents and Nemencio were standing and reported that "Juan" said it would be okay and believed that the agents had the money. Agent Hebisen was not close enough to identify the features of the Juan in the Buick who turned away every time Hebisen looked at the car, but Hebisen did notice that the man in the car was wearing a large tan jacket with a big collar.

Before leaving, Jesus arranged with the agents to make the exchange in the parking lot of the Pelican's Wharf Restaurant across the street. At about 2:45 Nemencio and an unidentified individual departed for Brownsville in the van followed by Jesus and Juan in the Buick. Both vehicles arrived in Brownsville at approximately 3:35 and parked in the Woolco lot. Almost immediately a red and white Oldsmobile Cutlass pulled up near the van and then drove slowly around the parking lot several times. When the red and white Cutlass left, the two individuals in the van got out and drove off in the Buick. Surveillance teams followed the Buick to the residence of Nemencio and Jesus Canales.

Meanwhile, the red and white Cutlass had reappeared at the Woolco parking lot and discharged an unidentified individual who drove the van to the outskirts of Brownsville to Gary Lagervall's trailer where it was presumably loaded with marijuana. After about 30 minutes the van returned to the Woolco lot where it was rejoined by the red and white Cutlass. The driver of the van, who was identified as Raul Ramirez, was picked up by the Cutlass as he walked toward some nearby stores. The Cutlass then circled the parking lot and discharged another individual at the van, at which point the van departed for McAllen followed by the Cutlass containing three individuals.

At about 4 agent Hebisen had called Nemencio who said that the marijuana would be loaded in about 15 minutes, but that the cocaine was not yet ready so they would deliver the marijuana first and the cocaine later. Nemencio called Hebisen back at about 5:15 to report that the van would be leaving shortly for McAllen with Jesus driving, while Nemencio waited in Brownsville for the cocaine. At approximately 7:20 Jesus met agents Hebisen and Hammonds in the Sand Bar Lounge at the Pelican's Wharf Restaurant. He told them that the van was outside loaded with 700 pounds of marijuana and asked if they had the money.

When the agents expressed concern regarding the safety of the marijuana, Jesus told them not to worry because he had three people outside guarding it. He also stated his regret that the agents had no more money because he and his friends planned to "float" 1,800 pounds across the border that night. Jesus indicated that he could supply up to 1,000 pounds of marijua-

na and a pound of nearly pure cocaine per week if the agents could use that much. At about 7:35, as the agents left the restaurant with Jesus and walked toward the van, they noticed the red and white Cutlass driving around the area. Hebisen described this at trial as a "heat run" to check for police. When Hebisen asked if the Cutlass contained the police, Jesus replied that they were his people who were guarding the marijuana and planning to take him back to Brownsville. After Hebisen inspected the contents of the van and told Jesus he was going to get the money to pay him, the Cutlass parked 15 to 20 feet from the van. At this point narcotics agents arrested Jesus and the three men in the Cutlass, appellant Juan Torres-Alaniz, Ramon Rangel and Raul Martinez. Torres-Alaniz, a Mexican, was wearing a tan or brown jacket with a large collar like that worn by the Juan in the Buick with whom Jesus Canales had conferred earlier in the day. The van contained roughly 760 pounds of marijuana.

At trial Jesus Canales [8] testified that the three individuals in the Cutlass had not participated in any way in the transaction organized by him and his brother Nemencio. He stated that he had met them by accident in the Woolco parking lot in Brownsville and, on learning they were going to Laredo, had asked them to follow him to McAllen to take him to the bus station in McAllen so he could return to Brownsville. He denied telling the agents that there were three people guarding the marijuana and stated that Juan Torres-Alaniz was not the Juan who had accompanied him and Nemencio to McAllen earlier that day.

*Discussion* :

On appeal Benito Canales asserts that there was a fatal variance between the indictment alleging a conspiracy to possess marijuana with intent to distribute and the proof adduced at trial. In addition, all four appellants, Benito Canales, Nemencio Ca-

nales, Eduardo Vasquez and Juan Torres-Alaniz, contend that the evidence was insufficient to support their respective convictions. These contentions are without merit.

■ With regard to the claim of variance, Benito Canales argues that the indictment alleged a single conspiracy running from October 17, 1977 to January 13, 1978 while the evidence at trial demonstrated the existence of at least two separate conspiracies, one set in October 1977 and the other in December 1977 and January 1978. The problem of variance is a recurrent one in the law of conspiracy where there is sometimes a question whether the activity of connected groups of conspirators is more aptly characterized as a single large conspiracy or a number of smaller ones. As the Supreme Court has made clear, however, not every variance constitutes prejudicial error.

The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused.

*Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); *see also Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Beil,* 5 Cir., 1978, 577 F.2d 1313, 1316–17, *cert. denied,* —— U.S. ——, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *United States v. Baldarrama,* 5 Cir., 566 F.2d 560, 566–67, *cert. denied,* —— U.S. ——, 99 S.Ct. 140, 58 L.Ed.2d 145 (1978); *United States v. Perez,* 5 Cir., 1973, 489 F.2d 51, 57, *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *United States v. Cruz,* 5 Cir., 478 F.2d 408, 413–14, *cert. denied,* 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973). "Variance from the indictment is not always prejudicial, nor is prejudice assumed." *United States v. Baldarrama, supra* at 566.

The evaluation of a claim of variance, therefore, involves application of a two-step

---

8. Jesus Canales was indicted for conspiracy to possess marijuana with intent to distribute, conspiracy to possess cocaine with intent to distribute, possession of marijuana with intent to distribute, and knowingly and intentionally carrying a firearm during the commission of a felony. He pleaded guilty to the charges of conspiracy to possess marijuana with intent to distribute and of possession of marijuana with intent to distribute.

analysis: first, to ascertain whether there was in fact a variance between indictment and proof, and second, to determine whether the variance was prejudicial. *See, e. g., United States v. Baldarrama, supra* at 565; *United States v. Perez, supra* at 57. As the second prong of this analysis is clearly dispositive of the instant case, we need not decide whether there were one or two conspiracies.

■ Benito Canales has failed to demonstrate any prejudice that might have resulted from any possible variance. He had adequate notice of the charges against him to prepare his defense and the evidence of his involvement in the conspiracy was sufficiently clear and distinct that there was no danger of "transference of guilt from one to another [conspirator] across the line separating conspiracies." *Kotteakos v. United States,* 328 U.S. at 774, 66 S.Ct. at 1252. As we said in *United States v. Baldarrama,* a case also involving one or more conspiracies to sell controlled substances, "no substantial right could have been affected, as the nature of the case was such that the jury could not easily have been confused and failed to consider individual guilt." 566 F.2d at 566–67.

■ As to the sufficiency of the evidence to support the appellants' convictions, the standard of appellate review of a jury verdict is whether "there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). This court's recent decision en banc in *United States v. Malatesta,* 5 Cir., 1979, 590 F.2d 1379, makes it clear that the *Glasser* standard applies to an evaluation of the evidence connecting an appellant to a conspiracy as well as to the evidence pertaining to other questions decided by a jury. None of the appellants in this appeal contests the existence of a conspiracy to possess marijuana with intent to distribute; rather they challenge the sufficiency of the evidence connecting them to the conspiracy.

■ Applying the substantial evidence standard to the facts of this case, we find the evidence sufficient to support the jury's verdict with respect to each of the appellants. Credible evidence adduced at trial showed that appellant Benito Canales was an active participant in the events of October 19, 1977, when a sale of marijuana was organized but failed at the last minute to go through. There was testimony that he was involved moving the rented U–Haul truck into which the marijuana was to be loaded and that the final exchange of money and marijuana was to take place at his house. He tried to find an alternative source of marijuana for Michael Brown on the evening of October 19 and agreed with Brown to help organize future drug transactions. It was pursuant to Benito Canales' referral that Carlos Sauceda called Brown in December 1977.

With regard to appellant Eduardo Vasquez, the evidence established that he accompanied Arturo Moreno to the agents' hotel room on October 19 and agreed with Moreno's statement that he was Moreno's supplier of marijuana and cocaine. He stated that he could supply the 1,000 pounds of marijuana, asked to count the money, and then promised to deliver the marijuana by 5 that afternoon. Later that evening, Vasquez accompanied Moreno to the hotel where he waited in the parking lot while Moreno and Brown talked to the agents.

The evidence of appellant Nemencio Canales' guilt is overwhelming with regard to each of the offenses for which he was convicted. He was deeply implicated in attempts to arrange various sales of marijuana and cocaine in December 1977 and January 1978, as well as in the consummated marijuana transaction of January 13, 1978. There was ample, credible testimony from which the jury could conclude that Nemencio Canales was one of the parties in possession and control of the marijuana on January 13.

Finally, we find the evidence sufficient to support the conviction of Juan Torres-Alaniz for conspiracy to possess with intent to distribute and for possession of the 760

pounds of marijuana on January 13. He was one of three passengers in the red and white Cutlass that had been involved throughout the afternoon in moving the marijuana from Brownsville to McAllen and the jury could reasonably have concluded that he was one of the three persons who Jesus Canales told agent Hebisen were guarding the marijuana. The jury could further have inferred that the Juan wearing a tan jacket with a large collar who was arrested in the red and white Cutlass was the same Juan in a tan jacket with a large collar seen earlier in the day in the black and blue Buick by agent Hebisen.

Accordingly, the judgment as to each of the appellants is

AFFIRMED.