## UNITED STATES of America, Plaintiff-Appellee,

v.

## Doug ARD, Jorge Castro, Pablo Lazaro Chavez, Eddie Ard, Carl Ard, Jose Alfonso, Guillermo Duarte, Defendants-Appellants.

### No. 82–5761.

United States Court of Appeals, Eleventh Circuit.

May 3, 1984.

Rehearings and Rehearing En Banc Denied June 25, 1984.

---

Geoffrey C. Fleck, Weiner, Robbins, Tunkey & Ross, P.A., Stephen J. Kogan, Miami, Fla., for Doug Ard.

Joel H. Brown, Brown, Huysman, Matthews & Singer, Miami, Fla., for Eddie Ard and Carl Ard.

Stanley Marcus, U.S. Atty., Miami, Fla., Eileen M. O'Connor, Asst. U.S. Atty., Fort Lauderdale, Fla., for plaintiff-appellee.

Before HILL and HATCHETT, Circuit Judges, and ALLGOOD *, District Judge.

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

ALLGOOD, District Judge:

Appellants, Doug Ard, Pablo Chavez, Jose Alfonso, Jorge Castro, Carl Ard, Eddie Ard and Guillermo Duarte, were convicted in the United States District Court for the Southern District of Florida on charges of conspiring to possess with intent to distribute in excess of 1,000 pounds of marijuana in violation of 21 U.S.C. § 846, and possession with intent to distribute in excess of 1,000 pounds of marijuana in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2. The individual appellants challenge their convictions on numerous grounds.

*Facts*

On January 14, 1982, Broward County Deputy Sheriff Dennis Robert Gavalier, posing as a marijuana dealer in need of a source of supply, contacted Joseph Height, whom he had met on several occasions, to negotiate a purchase. After "checking with his people," Height agreed to sell Gavalier 2,000 pounds of marijuana for $265 per pound. On January 15, Gavalier was informed that all arrangements had been made and he and deputy sheriff Ronald Cacciatore accompanied by DEA Agent, B.J. Church, drove to Height's residence in Fort Lauderdale to make the buy. Church was driving a large silver van which was ostensibly to transport the marijuana. In Gavalier's presence, Height telephoned a man he called Dennis and told him that they would be there in about forty-five minutes. Height informed Gavalier that Dennis wanted him to check the money. Gavalier showed Height $150,000 and told him that Church had the balance.

The three men, with Church following in the van, drove to Dennis Deveaugh's residence in Miramar where Deveaugh had two fifty-pound bales of marijuana. Gavalier checked the quality and Height and Deveaugh put the bales in Deveaugh's car and led the way to a horse ranch in rural Hialeah where the remainder of the marijuana was stored.

The forty-five acre ranch had the appearance of an ordinary horse ranch. The only entrance was a lengthy dirt road which ran along the southern perimeter of the property and ended near the East stable. North of the dirt road in the center of a clearing was a house trailer and tack shed. In the northeastern portion of the cleared area was a truck trailer. To the west of the truck trailer were the East and West stalls. The northern portion of the clearing was outlined with trees and a barbed wire fence. Police officers testified that the odor of marijuana was noticeable throughout the ranch.

When the agents arrived at the entrance to the ranch, Caccitore gave Church the $150,000 flash roll. Church remained at the entrance while the other two vehicles proceeded down the dirt road to the ranch. When the agents reached the cleared area, Height and Deveaugh were standing near their parked car with co-appellants Doug Ard, Carl Ard, Eddie Ard, Pablo Chavez, Guillermo Duarte and Jorge Castro. Deveaugh introduced Gavalier and Caccitore to Doug Ard, Jorge Castro and Pablo Chavez. The agents were not introduced to Carl and Eddie Ard or Duarte. Doug Ard turned to his brother Eddie and said, "Go set it up." Eddie responded by walking over to the East horse stable from which he had an unobstructed view down the dirt road to the entrance as well as to the house trailer and truck trailer. Doug Ard ordered Jose Alfonso to remain near the truck trailer from which he had an unobstructed view of the stable, the house trailer, the shed and the East stall.

The remainder of the group began walking towards the East and West stalls, passing an equipment shed where Duarte was told to remain. From this vantage point Duarte had a direct view of the truck trailer and both stalls.

The group passed the East Stall which contained numerous burlap bales identical to the bales of marijuana which the agents had seen at Deveaugh's house. Questioned about these bales by Deveaugh, Chavez responded that they were for another customer.

Height, Deveaugh, Doug and Carl Ard, Chavez, Castro and the two agents went on to the west stall. The west stall contained more of the same burlap bales. Cacciatore, Height and Carl Ard began removing the bales of hay which covered the marijuana. At the request of Gavalier, Ard cut open some of the marijuana bales for the agents to check the quality. Castro and Ard began separating bales, each of which had an identification number and the weight marked on it. As they were separated, these numbers were called out for Deveaugh and Chavez to record on a piece of paper and in a notebook. At some point there was a discussion about this becoming a regular 2,000 pound transaction.

Sometime during this process, Gavalier saw a red van drive up and stop near the house trailer. Chavez left to speak to the driver, saying it was probably a customer. The van left and Chavez returned, stating he had told the driver he was busy and to come back later.

After the 2,000 pound limit had been reached, the agents informed Chavez they had to go get the money, because their driver had been instructed to leave if they had not returned within twenty minutes. Cacciatore and Height then left in the unmarked vehicle.

Gavalier, Doug Ard, Castro, Chavez and Deveaugh started towards the shed where Alfonso and Duarte were maintaining watch. Chavez told Gavalier he wanted to total the weight and instructed Gavalier to go to the front of the house trailer. Gavalier met Carl Ard in front of the trailer then walked over to the stable where Eddie Ard was standing. Eddie saw the silver van coming down the dirt road, asked the agent what it was doing and was told it was the driver with the money.

In addition to Church, six officers were in the van. Church parked the van near the house trailer. As the officers emerged and identified themselves, everyone but Carl Ard began to run. Carl and Eddie Ard were apprehended immediately. Cas-

tro, Alfonso and Duarte were apprehended later in the woods. Doug Ard ran through the woods and eventually surrendered five days later.[1]

After the arrests, the officers discovered more than 19,000 pounds of marijuana having a wholesale value of over 5 million dollars. The two notebooks containing the tally sheets were also found.

A jury found all seven appellants [2] guilty on both counts of the indictment. Doug Ard was sentenced to a total of twenty-two years imprisonment, a special parole term of eight years and fined $25,000. Pablo Chavez was sentenced to a total of eighteen years, a special parole term of eight years and fined $75,000. Jose Alfonso was sentenced to fourteen years imprisonment, a special parole term of five years and fined $20,000. Jorge Castro, Carl and Eddie Ard and Guillermo Duarte were each sentenced to imprisonment for twelve years, a five year special parole term and fined $10,000.

### Legality of the Search

Doug Ard contends that the trial court erred in denying his motion to suppress the evidence which was seized, without a warrant or consent, from a locked trailer truck which he owned and which was parked on the property on which he lived.[3]

█ In order for Ard to prevail on his claim that the contraband was the product of an unlawful search and seizure he bears the burden of establishing first, that there was an invasion of a reasonable expectation of privacy, *United States v. Bachner*, 706 F.2d 1121, 1125 (11th Cir.1983), citing

*Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and second, that the challenged search and seizure was unreasonable. *Bachner, supra*, at 1125, citing *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

█ At the hearing on the motion to suppress, it was established that: (1) Doug Ard and his wife had been leasing the farm and various outbuildings for about one and a half years; (2) the locked truck trailer was a permanent fixture of the farm as there were no wheels attached to it; (3) the agents were lawfully on the property, having been invited there to finalize a drug deal; and (4) during the time the agents were there Doug Ard did nothing to indicate he wanted them to leave. The magistrate also found that the doors of the truck trailer were secured with a lock, but the doors did not meet, thus leaving a two inch gap through which the agents could observe the burlap bales from a distance of one to two feet. In adopting the recommendation of the magistrate to deny the motion to suppress, the trial court found that Ard lacked standing to challenge the use of the evidence as he had failed to prove an expectation of privacy in the truck.

In light of the strong odor of marijuana around the truck and the two inch gap in the opening of the doors which would allow anyone to look inside, we agree with the findings of the court below that Doug Ard failed to establish a "reasonable expectation of privacy" in the trailer truck. By failing to establish standing to protest the search, the motion to suppress was proper-

1. Doug Ard was the only one of the seven to testify at the trial. He explained that he had rented a portion of the ranch to a fellow named "Frank" whom he met at a rodeo two days earlier. Frank arrived the morning of the 15th driving a tractor and trailer truck and paid Ard $150 for three days rent. Ard thought that Frank was going to store hay, grain feed, saddles and tack for horses and showed him the available space.

 After receiving the rental he went out on the ranch to fix fences. When he returned there were several men there but he was never introduced to them. He further testified that he assisted in moving the bales but when he discov-

ered it was marijuana he became frightened. He had walked to the shed, trying to think of a way to get away when he heard yelling and screaming. He panicked at that point and ran through the woods to a telephone. Ard did not call law enforcement people, but a cousin.

2. Height and Deveaugh pled guilty to Count I and were not part of this trial.

3. After the arrests, the agents found 50 bales of marijuana in the East stall, 79 bales in the West stall, over 300 bales in the truck trailer and approximately 35 bales in the shed.

ly denied. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

Carl and Eddie Ard argue on appeal that they were on the ranch visiting their brother, that Eddie boarded horses there, and therefore they had standing to challenge the search. There was no evidence presented at the pretrial hearing by either of them as to standing. Additionally, Carl and Eddie must show that their own Fourth Amendment rights were violated. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). An expectation of privacy is not established by mere presence on the searched premises of their brother. The arguments of Carl and Eddie Ard are without merit.

*Sufficiency of the Evidence*

Appellants Carl and Eddie Ard, Jorge Castro, Guillermo Duarte and Jose Alfonso argue that there was insufficient evidence adduced at trial to support their guilty verdicts. As to Count I, they argue that the government failed to produce specific evidence of a deliberate, knowing, specific intent on their parts to join the conspiracy. *United States v. Morado,* 454 F.2d 167, 175 (5th Cir.1972), *cert. denied* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). When considering a challenge to the sufficiency of the evidence a reviewing court must examine the evidence in a light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and determine whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir., Unit B 1982), (en banc), aff'd — U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

The essential element of a conspiracy is an agreement by two or more people to violate the narcotics laws. *United States v. Lee,* 694 F.2d 649, 652 (11th Cir.1983) *cert. denied* — U.S. ——, 103 S.Ct. 1779, 76 L.Ed.2d 350 (1983). Mere presence coupled with flight is not sufficient evidence to sustain a conspiracy conviction. *United States v. DeSimone,* 660 F.2d 532, 537 (5th Cir.1981) *cert. denied* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149; 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982). The existence of the conspiracy agreement can be proven, however, by direct or circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of the scheme." *United States v. Ayala,* 643 F.2d 244, 248 (5th Cir. Unit A 1981).

Jorge Castro contends that the only *significant* evidence from which a jury might possibly infer his knowing and intentional participation in a conspiracy concerned his moving the bales of marijuana. He argued that while this would be sufficient to sustain his conviction for possession, it is insufficient to support a conspiracy conviction.

The Government established much more than mere movement of the bales. Castro was introduced to Gavalier by Deveaugh and was present when Doug Ard ordered Eddie Ard to "Go set it up." He was present during negotiations, helped segregate the bales of marijuana at the West stall, was part of the group that went to the shed when the weights were to be totalled and he fled when the agents arrived. After reviewing the totality of the circumstances and applying the *Bell* standard we conclude that there was sufficient evidence to support the conviction of Castro on Count I, the conspiracy count of the indictment.

Jose Alfonso, Guillermo Duarte and Carl and Eddie Ard contend the evidence was insufficient to support a conviction on either count of the indictment. Alfonso and Duarte point out that they were never introduced to the agents, did not participate in the negotiations, and were not present when the bales of marijuana were segregated and the weights tallied. Carl and Eddie Ard argue they were merely visiting their brother who lived there and that Eddie entered the stall to check on his horse.

Once again we are required to look at the totality of the circumstances.

Carl Ard was present during the initial introductions. Carl and Eddie Ard, Alfonso and Duarte all acted as lookouts during the drug transaction. Each was told by Doug Ard to stay in a particular place where they were able to maintain a watch. Because their roles were minor or subordinate does not mean they were not part of the conspiracy. *United States v. Wilson,* 500 F.2d 715, 724 (5th Cir.1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975). If based on all the evidence the jury could conclude that they each knowingly agreed to be part of an activity in violation of the law, then the convictions must stand. In light of the size of this operation, the precautions that were taken, and the pervasive odor of marijuana throughout the cleared area, it takes no stretch of the imagination to conclude that each one knew and participated in the overall conspiracy even if they were not privy to all details. Drawing all inferences in favor of the government, we find there is sufficient evidence in the record to support the convictions of Carl and Eddie Ard, Alfonso and Duarte on both counts of the indictment.

## Variance Between Indictment and Proof

■ Chavez, Alfonso and Duarte allege that there was substantial variance between the indictment and the proof on the conspiracy charge. They contend that Count I of the indictment charged them with conspiring to possess with intent to distribute more than 1,000 pounds of marijuana to officers Gavalier and Cacciatore, while the evidence established a conspiracy to make a single sale. If, however, the rights of the appellants were not substantially prejudiced by the variance then it is immaterial. *United States v. Ramos,* 666 F.2d 469, 477 (11th Cir.1982); *United States v. Canales,* 596 F.2d 664 (5th Cir.

1979). Variance from an indictment is not always prejudicial, nor is prejudice assumed. *United States v. Baldarrama,* 566 F.2d 560, 566 (5th Cir.1978) cert. denied 439 U.S. 844, 99 S.Ct. 140, 58 L.Ed.2d 145 (1978).

■ In order for the appellants to prevail on this point they must show in addition to a variance, that they were in fact prejudiced by the variance. *United States v. Canales,* 596 F.2d 664 (5th Cir.1979). Each defendant had adequate notice of the charges against him in order to prepare a defense and there was sufficient evidence for a jury to conclude that the agents were not the only customers. The appellants have failed to show that they were prejudiced by any possible variance.

## Conflict of Interest

Appellant Castro alleges that he was denied his right to conflict free representation in violation of the Sixth Amendment and the right to due process of law in violation of the Fourteenth Amendment because of the actual conflict of interest which arose from his trial counsel's representation of a co-defendant. Castro speculates that he was prejudiced in the plea bargaining arena because of the dual representation, since the other person represented by the same attorney was one of the men in charge and that he had little, if any, involvement in the scheme. Castro would have this court reverse his conviction because an inquiry into any possible conflict was not made by the court, pursuant to Fed.R.Crim.P. 44(c),[4] prior to trial.

■ For a conflict of interest to cause representation to fail Sixth Amendment standards, the conflict must be actual, not speculative. *United States v. Alvarez,* 696 F.2d 1307, 1309 (11th Cir.1983),

---

4. Fed.R.Crim.P. 44(c) provides:

 Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

cert. denied — U.S. ——, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983); *Baty v. Balkcom,* 661 F.2d 391, 395 (5th Cir. Unit B 1981), *cert. denied* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982). Until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. *Baty v. Balkcom, supra,* at 396. Neither Castro nor Chavez testified at trial. They did not maintain antagonistic defenses. We do not agree that there was such disparity in culpability that the attorney would be confronted with a conflict of interest.

As no actual conflict was demonstrated by Castro, the court's failure to follow Fed. R.Crim.P. 44(c) and inquire into any possible conflict of interest does not constitute reversible error. *United States v. Alvarez,* 696 F.2d at 1309.

*Statements of Co-conspirators*

■ Appellants Carl and Eddie Ard contend that the court erred in allowing a prosecution witness to testify about statements made by alleged conspirators without the required showing of the existence of a conspiracy and the appellants' connection with it.

In order for such statements to be admitted, the trial judge must find substantial evidence that a conspiracy existed, that the co-conspirators and the defendant against whom the statements are being offered were members of the conspiracy and that the statements were made during the course and in the furtherance of the conspiracy. *United States v. Alvarez,* 696 F.2d 1307, 1310 (11th Cir.1983); *United States v. James,* 590 F.2d 575 (5th Cir. 1979), *cert. denied* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Such a finding should be made without the use of the actual statements.

The trial judge conducted a hearing prior to trial. After the hearing, based on the facts the government proposed to prove, the judge determined there was sufficient evidence of a conspiracy and Carl and Eddie's participation to allow the introduction of the statements in question. We find no error in this determination.

*Restrictions on Cross-examination*

■ At trial the prosecution objected to three questions that Carl and Eddie Ard attempted to ask Doug Ard on cross examination.[5] The objections were sustained by the court. The appellants now contend that this restriction on their right to cross examine a witness violated their Sixth Amendment right to confront a witness. No argument was made at trial by the attorney for Carl and Eddie Ard as to the basis for the admissibility of the questions. No restriction of their rights has been demonstrated on appeal. After carefully reviewing the record we find there was no error on the part of the trial judge in sustaining the objections and there was no violation of the appellants' Sixth Amendment rights.

*Presentation of a Defense*

■ Doug Ard argues that his conviction should be set aside because he was prevented from presenting a defense because he was not allowed to testify regarding his own state of mind and conversations he had with "Frank" concerning the rental of the property.

A review of the record indicates that Ard's attorney, during direct examination, made a proffer at side bar regarding the testimony he wanted to elicit from Ard. Ultimately the appellant was permitted to testify about each item mentioned in the offer of proof. We can find no violations of Ard's Fifth, Sixth or Fourteenth Amendment rights on this account.

---

5. The questions they were not permitted to ask were:

Q. How often would he (Eddie) come to Miami?

Q. When Carl and Eddie would come to the ranch would they necessarily follow you all over the ranch or would they tend to their own business?

Q. Were Eddie and Carl part of any conspiracy to purchase or sell or distribute marijuana?

*Impeachment with Pre-arrest Silence*

On the day of the arrests, when the officers made their presence known, Doug Ard escaped through the woods and surrendered voluntarily only after the issuance of a warrant four or five days later. At trial, Ard testified that he returned from repairing fences to discover strangers on his property involved in a drug deal. He stated that he panicked and ran when he heard all the yelling, not realizing that it was the police who were responsible for the commotion. He argues that being completely innocent himself, he had no reason to go to the police and confess the presence of 20,000 pounds of marijuana. Ard now contends that his right to remain silent was violated when the court allowed the prosecutor to cross-examine him and impeach him with his pre-arrest, pre-*Miranda* silence.

 An accused is never required to take the stand during the trial and when the choice is made not to take the stand, the prosecutor may not comment on that silence. However, when the accused voluntarily takes the stand to protest innocence, the Fifth Amendment is not violated when the truthfulness of those statements is tested by the prosecutor's questions about prior inconsistent statements or acts. *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). Such was the case here.

 The *Jenkins* court said that prior silence cannot be used for impeachment purposes where silence is not probative of a defendant's credibility and where prejudice might result. Id. at 239, 100 S.Ct. at 2125. The circumstances surrounding Ard's silence are strikingly similar to those in *Jenkins.* Like Jenkins, Ard was not induced to remain silent prior to arrest by any governmental action. His failure to speak occurred prior to his arrest and prior to any *Miranda* warnings. After considering the possible prejudice to the defendant, we conclude that impeachment by use of the pre-arrest silence was not a violation of the Fourteenth Amendment.

*Disproportionate Sentence*

 As his final assignment of error, Doug Ard contends that his sentence was disproportionate to those of his co-conspirators and that he was penalized for taking the stand in his behalf merely because the judge did not believe his testimony.

There is no question that a federal district judge has wide discretion, within statutory limitations in deciding the sentence to impose. As long as the sentence is within statutory limits and there is no showing of arbitrary or capricious action amounting to a gross abuse of discretion, it will not be questioned on appeal. *United States v. Atkins,* 618 F.2d 366, 374 (5th Cir.1980); *United States v. Hayes,* 589 F.2d 811 (5th Cir.1979), *cert. denied* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979).

The maximum sentence allowed for a violation of 21 U.S.C. § 841(a)(1) is 15 years imprisonment, a $125,000 fine and a minimum three year special parole term. Ard received a sentence of eight years on this count. The maximum sentence for a violation of 21 U.S.C. § 846, is fifteen years imprisonment and a $125,000 fine. Ard was sentenced to fourteen years in prison, a special parole term of eight years and fined $25,000 on this count. The two sentences are to run concurrently. Ard has failed to show that this amounted to an abuse of discretion.

*Prejudicial Statements of the Prosecutor*

 Appellants Chavez, Duarte and Alfonso argue that a comment made by the prosecutor during closing arguments constituted "plain error" and their convictions must be reversed.

During the course of the trial, Agent Cacciatore's name was mentioned on numerous occasions, however, he was never called to testify for either side. Three of the defense attorneys made specific reference to this fact in their closing arguments. In response to the comments of defense counsel, the prosecutor stated:

Now, there's been a lot made by defense counsel of the fact that we didn't hear from Agent Cacciatore. I will ask you,

ladies and gentlemen of the jury, how much longer do you want to stay here? It's Friday afternoon. Would you care to have heard the whole story hashed out all over again from Agent Cacciatore? I don't know about you but it's Friday afternoon. But I will tell you something about Agent Cacciatore. Agent Cacciatore is available not only to the Government, but if one of these defense counsel is so sure Agent Cacciatore is going to tell a different story, Agent Cacciatore is available to the other side also. He's not just my witness. Just like B.J. Church, both sides to call B.J. Both sides are permitted and have available to them and permitted to call Agent Cacciatore.

The prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel. *United States v. Russell*, 703 F.2d 1243, 1248 (11th Cir. 1983). When statements otherwise inadmissible are elicited by the defense they amount to "invited error." *United States v. Males*, 715 F.2d 568 (11th Cir.1983), and do not constitute reversible error.

After careful consideration of the various contentions of the defendants we find that the conviction of all defendants on both counts of the indictment should be affirmed.

AFFIRMED.